# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
January 14, 2015 Session

## STATE OF TENNESSEE v. WILLIAM JASON HARRIS

**Appeal from the Circuit Court for Bedford County**
**No. 17534, 17658      Franklin L. Russell, Judge**

---

**No. M2014-00375-CCA-R3-CD - Filed June 9, 2015**

---

A Bedford County Jury convicted Defendant, William Jason Harris, of promotion of methamphetamine manufacture, and Defendant pled guilty to failure to appear. He received consecutive sentences of twelve years for promotion of methamphetamine manufacture and six years for failure to appear to be served in confinement. On appeal, Defendant argues: (1) that the trial court erred by allowing the State to impeach his mother's testimony with Defendant's prior convictions; (2) that the trial court erred in allowing evidence of Defendant's past use and manufacture of methamphetamine to rebut Defendant's assertion that he was coerced and threatened into committing the offense of promotion of methamphetamine manufacture; (3) that the trial court improperly allowed the State to admit the "pseudoephedrine log" which contained Defendant's past attempts to purchase pseudoephedrine; (4) the trial court did not fulfill its role as thirteenth juror, by allowing the jury's verdict to stand; and (5) the trial court erroneously denied Defendant's request for a sentence of community corrections. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Thomas S. Santel, Jr., Murfreesboro, Tennessee (on appeal); and William Stanley Bennett, Murfreesboro, Tennessee (at trial) for the appellant, William Jason Harris.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Robert Carter, District Attorney General; Michael David Randles and Richard Cawley, Assistant District Attorneys General; for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

Agent Shane George of the Shelbyville Police Department, who is assigned to the 17th Judicial District Drug Task Force, testified that on June 5, 2012, he learned from a CVS pharmacy employee that Mary White was attempting a suspicious purchase of pseudoephedrine at the CVS pharmacy on Lane Parkway in Shelbyville. Agent George drove to the pharmacy and conducted surveillance in the parking lot. Agent Brad Martin also arrived and aided with surveillance. Agent George observed Ms. White walk out of the store and get into a silver Kia vehicle with three male occupants, including Defendant, Defendant's brother James Dewey Harris (a.k.a. "D"), and Samuel Brent Fults who is Ms. White's son. Agent George then observed the Kia, driven by "D", travel to the Rite Aid pharmacy located a few blocks from CVS. He testified that "D" and Mr. Fults exited the vehicle and walked into Rite Aid together. Ms. White and Defendant remained in the car.

During that time, Agent George learned that Ms. White was unable to purchase any pseudoephedrine from CVS because she did not "present the correct symptoms to the pharmacist." He then observed "D" and Mr. Fults get back into the Kia, and "D" drove to the Walgreens pharmacy located on North Main Street. Agent George observed Ms. White and one of the men get out of the car and walk into the pharmacy. He noted that "there was a lot of back and forth movement between the, the vehicle and the pharmacy. I think there were, at least, one in and out that took place by those individuals. So, they, they went in, they came out, they went back in, and they came out." Agent George attempted to call Walgreens and notify them of possible criminal activity but he could not get an answer. He then pulled up the National Precursor Log Exchange and determined that there was no sale of pseudoephedrine that took place while the individuals were in the pharmacy.

Agent George testified that Ms. White and the other individuals got into the Kia and drove back to CVS. He said:

> Once they were at the CVS pharmacy, I saw Mr. Fults, back, the male backseat passenger and Mary White's son, exit the vehicle and go into the pharmacy. And within just a short period of time he came back out and he was carrying a pharmacy bag that's consistent with, you know, going into the pharmacy and getting a box of pseudoephedrine and then coming out with it in a bag.
>
> Now, the vehicle that, that they were in was parked on the, the sheriff's office side of the pharmacy. Mr. Fults came out. Instead of going back directly to

2

the vehicle, he made a, if you're looking at him at the front of the pharmacy, he went to my left, be his right, and walked all the way down to, past the little cut-through there in that strip mall. And he walked out of my sight towards the back of the store. And Special Agent Martin was back there observing his actions.

And then within a, a relatively short period of time, he came back around the front of the store and he was empty-handed. He no longer had the bag and he no longer had the box of pseudoephedrine in his hands, which is, is, you know, I thought was a little strange but not uncommon.

So, I observed Mr. Fults then get into the vehicle with the Harrises [sic] and Ms. White. They pulled out of their parking spot, went back out, got on North Main Street, and went directly up to the [Walmart] pharmacy located on North Main Street. Now, I was able to video record Mr. Fults' activities at the CVS, and I continued video recording the, once they arrived at the [Walmart] location.

Agent George observed Defendant, Ms. White, "D", and Mr. Fults walk into Walmart as a group, and they walked over to the pharmacy section of the store. Agent George noted that while in the parking lot, before entering the store, he observed what appeared to be money being exchanged between the four individuals. Agent George walked in the store and over to the pharmacy, spoke with the pharmacist, and gave him a description of Defendant, Ms. White, "D", and Mr. Fults. Agent George also told the pharmacist that the group of individuals may attempt to buy pseudoephedrine products and to notify Agent George if a transaction occurred. Agent George turned around and saw Ms. White in line behind him with a box of pseudoephedrine that he later watched her purchase. Agent George observed "D" purchase a bottle of hydrogen peroxide, and Defendant purchased a large quantity of matches. Agent Martin observed the individuals as they walked out of Walmart and got into the car. The vehicle turned on 231 North and drove toward Rutherford County.

Agent George testified that he left the store and "hurried to my vehicle because I knew at that point that, you know, we had two confirmed boxes of pseudoephedrine that were in the vehicle and then hydrogen peroxide and the matches, which are components used to manufacture methamphetamine." He then followed the Kia out of the parking lot. Within a short period of time, Agent George paced the vehicle and determined that the vehicle was traveling sixty miles per hour in a fifty-mile per hour zone. At that time, Agent George felt he had grounds to stop the vehicle; however, he decided to make sure that the occupants in the car did not intend to make any further stops to purchase additional items. Once the vehicle approached the intersection of "82 and 231 North" and turned right, Agent George

3

activated his blue lights and pulled the vehicle over at a BP station. Agent Martin also arrived on the scene. "D" was driving, and Defendant was sitting in the front passenger side of the vehicle. Mr. Fults and Ms. White where sitting the back seats. Agent George asked for "D"' driver's license, which "D" provided. Agent George then verified that "D's" license was not suspended or revoked, and he asked "D" for permission to search the vehicle, which "D" denied. Agent George explained that at that point he performed a warrantless search of the vehicle.

Agent George asked Defendant to exit the vehicle, and Agent George searched him. Agent George found seven individual "blister packs" of pseudoephedrine tablets that had been removed from the box in the crotch area of Defendant's pants. He also asked the other occupants of the vehicle to step out, and he searched them. Agent George testified that Defendant had boxes of matches underneath him in the car that had been torn open, and the process of removing the "striker plate" from the matches had begun. Agent George searched the vehicle and found a Walmart receipt, a bottle of hydrogen peroxide that had been purchased by "D", a CVS receipt that reflected the purchase of CVS brand decongestant in an amount of 2.88 grams, an empty box of Walmart brand cold medicine which contained pseudoephedrine, coffee filters, razor blades, a hole punch, tweezers, digital scales, insulin syringes, and a "meth pipe." Agent George noted that some of the items were tools "commonly found around people that are manufacturing methamphetamine." He also testified that insulin syringes are "commonly used by addicts to inject the methamphetamine into their bloodstream." Agent Martin collected all of the evidence from the vehicle after the search.

Sometime later, Agent George was completing paperwork for the seizure of the vehicle "because it was used during the commission of a felonious crime." When he went to serve the paperwork on "D," who was in custody, Agent George was informed by a correctional officer that Defendant wanted to speak with him. Agent George informed Defendant that he did not have to speak with him but Defendant was "very adamant about wanting to speak with [him] at that point." Agent George testified:

> I explained to him that I worked directly for the district attorney's office and that any cooperation I was able to get from him I would be able to take back to [the] district attorney's office and provide them that information. And if we were able to do anything proactive with his information, then that would be good for him and I could provide that to the DA's office and then they would take that into consideration when it came time to adjudicate his charges, you know, dispose of them in court, in the, in the courtroom. And, and he told me [he] understood and we went on about the business of conducting the interview.

4

Agent George testified that Defendant stated he, "D", Mr. Fults, and Ms. White were in Shelbyville together to purchase "cold pills." Defendant noted that Mr. Fults had initially called and said that he would purchase pseudoephedrine in exchange for methamphetamine. Defendant told Agent George that he used the "red phosphorous" method of making methamphetamine and described the process. He admitted that he had traded methamphetamine for "boxes on at least one occasion." Defendant told Agent George that his "course of action" on June 5, 2012, was a "finished product" of methamphetamine. He thought that he could have made three grams of methamphetamine out of the pseudoephedrine purchased. Defendant also provided information concerning a prescription pill drug dealer. Agent George understood that Defendant would then act as a confidential informant in building a case against the dealer. Agent George gave Defendant a contact number, and when Defendant made bond and was released from custody, he briefly contacted Agent George two or three times but failed to maintain contact. During the interviews, Defendant never told Agent George that he had been threatened by his brother, James Dewey Harris (a.k.a. "D").

Agent George checked the pseudoephedrine purchase database and learned that Defendant's purchase history was approximately four-and-a-half pages long. At approximately 7:10 p.m. on June 4, 2012, Defendant attempted to purchase a 2.88-gram box of pseudoephedrine at the CVS located at 825 North Main Street in Shelbyville. Agent George testified that Defendant was blocked from the purchase "because he was outside the compliance, the weight for the compliance within a 30-day period, that at that point in time was nine grams of pseudoephedrine purchased, . . . within a 30-day period." Defendant also attempted to purchased a box of pseudoephedrine on the same date at approximately 8:28 p.m. at the Walgreens across the street from CVS. The sale was again blocked because of the "federal compliance measures that were in place."

Mary White testified that on June 5, 2012, she got into the car with Defendant, "D", and her son, Mr. Fults, and they drove to Shelbyville. They first stopped at CVS, and Ms. White attempted to purchase a box of pseudoephedrine, but the purchase was denied. She said that the purchase was for "D". Ms. White testified that they next stopped at Walgreens, and everyone went inside. She said that no one attempted to purchase any pseudoephedrine, and they left and drove to Walmart. Ms. White admitted that the purpose of going to Wal-mart was to purchase a box of pseudoephedrine, which she did. She testified that Mr. Harris showed her what to buy. Ms. White was aware that the pseudoephedrine was to be used to make methamphetamine because she "heard people talk about it." She was arrested after making the purchase.

Bonnie Sue Hawkersmith, Defendant's fiancé, testified that she inadvertently mailed a letter written by Defendant to the district attorney's office. She said that the letter was

supposed to have been mailed to the pastor of the church that she attended. In the letter, Defendant made the following admission:

> 'My brother, ["D"], was making it,' [    ]. 'I did help him get things to make the day [sic], the drug along with the mother, son, that was with us. And the two of us which also buying things to help with the process. But my brother, ["D"], being the one that was the actual maker of the drug.

Ms. Hawkersmith presumed that the drug Defendant was referring to was methamphetamine.

Defendant's brother, "D", testified on behalf of Defendant. He said that prior to June 5, 2012, he and Defendant were enrolled in vocational school together in McMinnville. "D" testified that on June 5, 2012, he and Defendant got out of school at approximately 3:00 p.m. and drove to Manchester to pick up Mr. Fults and Ms. White. "D" was driving, and they drove to Shelbyville. "D" testified that Defendant "kind of blew and shook his head" because he knew that "D" was going to Shelbyville to purchase pseudoephedrine to make methamphetamine. "D" claimed that Defendant knew that "D" would become "sick" if he did not get any methamphetamine to use, and then Defendant would not have a ride to school. He said that Defendant also knew that he had a temper. "D" testified that he knew Mr. Fults because they were in prison together.

"D" testified that they drove to CVS in Shelbyville, and the following took place:

> Mr. Fults went in and, and they bought the pseudoephedrine, and, and when he, when he came out, he sent his mother in and she was, kind of, nervous about going in. And he said, Momma, you mean, you mean to tell me that we've come all this way and you're not even going to go in, he's going to give us $50 for this box of pseudoephedrine, you mean, to tell me - - and as far as - - the only thing my brother ever said in that car on that ride was, he turned around and said, Man, that, she ain't got to go in that store if she don't want to. And they, they, kind of, fussed about that for a little while.

"D" testified that Defendant did not go into the CVS, and he did not ask Defendant to go in the store. Ms. White then went into Rite Aide, and she attempted to purchase pseudoephedrine but the sale was denied. At that point, "D" testified that Defendant was ready to go home but he said that Defendant knew that "D" was going to "get [his] way or else."

"D" testified that he went into Walmart. He admitted to having a picture of a box of pseudoephedrine on his phone so that Mr. Fults did not purchase the wrong product. "D"

6

testified: "Because once you purchase a box of pseudo, you can't buy any more until, like, a 48-hour deal." He said that Defendant was against making methamphetamine; however, he admitted that Defendant purchased the matches in Walmart. "D" testified that he asked Defendant to start breaking down the matches in the car. He said that Defendant was trying to "keep the peace" with him because Defendant needed a ride to school. "D" also said that Defendant attempted to hide the pseudoephedrine pills for him when they were stopped by Agent George.

On cross-examination, "D" believed that Defendant may have started using methamphetamine, "but it wasn't nothing like ["D"] was using it." Defendant had indicated during the interview with Agent George that he would receive "two-tenths of a gram" of methamphetamine. However, "D" testified that the methamphetamine would have been split between "D", Ms. White, and Mr. Fults. "D" claimed that although Defendant indicated to Agent George that he and "D" were making methamphetamine together, "D" was "doing [his] own cook" on June 5, 2012.

Wanda Eastes is a registered nurse and mother to Defendant and "D". She testified:

They have very different personalities. ["D"] is, was the oldest. He developed an aggressive personality. The leader, usually. He was the leader of the two. We dealt a lot with ["D's"] personality problems, I guess, you might say. We tiptoed around him quite a bit.

And [Defendant] was more laid back. More a peacemaker, I guess. He, he wanted things to, he had some goals and some dreams. And the two of them - - ["D"] didn't seem to have that. He didn't seem to look forward to those kind of things. [Defendant], kind of, was led by ["D"] quite a bit. There's so much I want to say about the two. I guess that the, personality-wise, I could depend on [Defendant] and I couldn't depend on ["D"].

Ms. Eastes testified that "D" would sometimes become violent, and she had seen him act aggressively toward Defendant. She testified:

I saw a lot of aggression. You couldn't make ["D"] mad because he would react. And there was a time that he got mad - - and I don't know what over, you would never know what it was most of the time, but he threw a, a brick through the windshield of the car that [Defendant] was in, driving.

Ms. Eastes testified that she was shocked to learn that Defendant had been arrested for the present offenses. She said:

7

Because I knew what [Defendant] wanted. I knew what he was doing. I knew he was, he was - - I know his routine. He would call me, sometimes, and, and - - on the weekends. And when we went to church, he would, it was always, you know, about his school and about Suzie and the kids and, and, and how he wanted a life, and, you know, he wanted to, to, he wanted to become a, he wanted to finish his schooling. And he wanted to, to have a, a like with, with her and those children.

Ms. Eastes noted that Defendant had a lot of sinus-related problems and that he took pseudoephedrine for those problems.

On cross-examination, Ms. Eastes agreed that none of "D's" prior convictions were for any violent offenses. She admitted that Defendant had prior convictions for vehicular homicide, facilitation of aggravated robbery, aggravated burglary, theft over $500, failure to appear, vandalism over $500, theft over $1,000, and contraband in a penal facility. Defendant also had two additional felony convictions in Coffee County.

## II. Analysis

### A. Cross-examination of Wanda Eastes on Her Knowledge of Defendant's Prior Convictions

Defendant contends that the trial court committed reversible error by allowing the State to cross-examine Defendant's mother, Wanda Eastes, concerning her knowledge of Defendant's prior convictions. We conclude that there was no reversible error.

Defendant's theory of defense was that he was an essentially an unwilling participant in the promotion of methamphetamine and that he acted as a result of coercion or intimidation by his brother, "D."

At trial, Ms. Eastes was called as a character witness for Defendant. She testified that Defendant was "laid back" and a "peacemaker" and often led by "D." Ms. Eastes testified that "D" was sometimes aggressive toward Defendant. She was surprised to receive a phone call from the Bedford County Sheriff's Department indicating that Defendant had been arrested. Ms. Harris testified: "And that was unbelievable to me. I, I could accept that it was "D." I, I - - but it was very shocking that [Defendant] was there." As noted above, Ms. Eastes further testified:

Because I knew what [Defendant] wanted. I knew what he was doing. I knew he was, he was - - I knew his routine. He would call me, sometimes, and, and -

- on the weekends. And when we went to church, he would, it was always, you know, about his school and about Suzie and the kids and, and, and how he wanted a life, and, you know, he wanted to, to, he wanted to become a, he wanted to finish his schooling. And he wanted to, to have a, a life with, with her and those children.

Ms. Eastes was aware at the time of the trial that Defendant had used methamphetamine in the past but she was not aware that he was involved in it at the time of his arrest, and she found it "shocking." She also said that it "wasn't him." Ms. Eastes testified that Defendant was eager to attend school, and he worked with the youth at church. She also noted that Defendant had severe sinus-related problems from an injury to his face at the age of fourteen and that is why he used pseudoephedrine. Ms. Eastes testified that due to the injury to his face from a four-wheeler accident, Defendant "should never get another lick to the face, or to the nose, or around the eye." Therefore, she did not want him fighting with anyone.

After Ms. Eastes' direct testimony the trial court held a jury-out hearing to determine whether the defense had "opened the door" for the State to question Ms. Eastes about Defendant's prior criminal history. The court stated:

Folks, I suspect the General is getting ready to tell me that the door has been opened with regard to proof about certain conduct, including, I suspect, the 11 prior felony convictions that he alleges this defendant has, including facilitation of aggravated robbery, including vehicular homicide, including burglary.

And I would point you to Rule 608 with in mind that this is talking about the character of a witness in 608, but this, this statement is, is in the advisory comments, "If the witness makes a sweeping claim of good conduct on direct examination, that claim may open the door to cross-examination without pretrial notice and with a lower standard of probativeness[,] as rebuttal of the broad claim would itself tend to show untruthfulness."

This witness has just painted the defendant as a virtuous individual and has contrasted that with his brother, "D." General, I'm not trying to put words in your mouth, but this is, because I suspected this was going to be the issue, that's why I excused the jury 'cause I thought it might take us a few minutes to deal with this.

After hearing arguments from each side, the trial court made the following findings:

Respectfully, I believe the door has been opened except to this degree, I'm not going to allow reference to the two sale convictions other than to refer to them as two additional felony convictions. The vehicular homicide, obviously, there's violence in that. The aggravated burglary is not closely related to the crime here. The robbery involves violence, and she had specifically stated, she has specifically testified about the propensity of violence of the one son and not the other. The theft, yes. The failure to appear because it's a, a conviction, and the contraband in a penal facility.

I'm going to allow nine of them to be, for her to be questioned about those specifically. The two sales, even though the probative value is enormous, the potential prejudicial effect there may possibly outweigh that.

We had tried very hard to keep prior conduct out of the case, and, and in all honesty the defense had brought it in both by asking about meth use, but in this particular case, by painting this person as virtuous and in contrast with [a] violent and troubled brother. The jury would be grossly misled, and that has made the probative value of the prior convictions, except for the two, and makes that greatly outweigh the unfair prejudicial effect.

There's very little unfair about the prejudicial effect because of the way these issues, who, who is injecting them into, into the case and the degree to which a misimpression has been to, potentially, brought into the jurors' minds.

As pointed out by the State, the trial court in this case improperly cited Tenn. R. Evid. 608 to find that the State could cross-examine Ms. Eastes about her knowledge of Defendant's prior convictions. Rule 608 does not address the admission of evidence of Defendant's prior convictions to challenge the testimony of a witness testifying about a defendant's good character. However, Tennessee Rule of Evidence 404(a)(1) provides:

(a) Character Evidence Generally - Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(1) Character of Accused - In a criminal case, evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same or, if evidence of a trait of character of the alleged victim of the crime is offered by the accused and admitted under Rule 404(a)(2), evidence of the same trait of character of the accused offered by the prosecution.

Rule 404(a)(1) reflects an exception to the general bar on the admissibility of character evidence and permits the defendant in a criminal case to "open the door" by introducing evidence of his or her own character. Neil P. Cohen, et al., Tennessee Law of Evidence § 4.04[a] (5th ed.2005). Until the defendant takes this step, however, the State cannot introduce evidence of a defendant's bad character.

> Once the accused introduces evidence of his or her own good character, the State may also address the issue of the accused's character in order to prevent the trier of fact from receiving a one-sided view of the defendant's character. *Id.* at § 4.04[4][a]. Furthermore, the defendant's proof under Rule 404(a)(1) is limited to reputation and opinion evidence only. *Id*. at § 4.04[4][c]. However, under Rule 405(a), the State may introduce evidence of specific instances of conduct when cross-examining a defense witness in response to the presentation by the accused of this reputation or opinion character evidence. *Id*. These include acts resulting in criminal convictions. *Id.* Additionally, Rule 405 requires the court to hold a jury-out hearing to determine whether a reasonable factual basis exits for an inquiry and to determine whether the probative value of a specific instance of conduct regarding the character witness' credibility outweighs its prejudicial effect on substantive issues. Tenn. R. Evid. 405(a)(1)-(3).

*State v. Davidson M. Taylor*, No. W2006-00543-CCA-R3-CD, 2007 WL 3026374, at *4 (Tenn. Crim. App. Oct. 12, 2007).

In this case, although the trial court referred to the incorrect rule of evidence to justify its ruling that Ms. Eastes could be questioned about Defendant's prior criminal record, the trial court followed the procedural mandates of Rule 405. That is, it held a hearing outside the presence of the jury, after which it determined that a reasonable factual basis existed for the inquiries, and the probative value of the specific instances of conduct on Ms. Eastes' credibility outweighed its prejudicial effect on the substantive issue. *See* Tenn. R. Evid. 405(a). We note that some of Defendant's convictions were more than ten years old. However, Tenn. R. Evid. Rules 404 and 405 do not impose a time limit on the prior convictions used to counter evidence of good character. *See State v. Davidson M. Taylor*, 2007 WL 3026374, at *3.

We find that Defendant in this case opened the door to the presentation of rebuttal character evidence. Ms. Eastes' testimony essentially characterized Defendant as a non-violent law-abiding citizen in contrast to her other son "D," whom she claimed was violent and troubled. Despite her knowledge of Defendant's criminal history, which included convictions involving violence, Ms. Eastes testified that she was shocked to learn that

11

Defendant had been arrested on June 5, 2012. In *State v. Sims*, 746 S.W.2d 191, 194 (Tenn. 1988), the supreme court noted that "in Tennessee a character witness may be cross-examined as to what [she] has heard in the community about the character of the defendant to show that [her] conclusion as to the defendant's reputation is unsupported or to test the accuracy and candor of the witness [herself]." As pointed out by the trial court, it would have been "grossly" misleading to the jury to allow Defendant to "open the door" to character evidence and not allow the State to rebut that evidence. The trial court properly allowed the State to cross-examine Ms. Eastes to test her knowledge of defendant's criminal history.

We do find however, that it was error for the trial court to allow the state to cross-examine Ms. Eastes about "two other felony convictions out of Coffee County" without identifying what crimes Defendant was convicted of. This issue was not addressed by the State in its brief. Therefore, any argument by the State is waived. In *State v. Galmore*, 994 S.W.2d 120 (Tenn. 1999), the Supreme Court held that a limiting reference to a prior felony as "a felony" without any further identification is improper in the context of Tenn. R. Evid. 609(a)(3).

> Not identifying the felony . . . would permit a jury to speculate as to the nature of the prior conviction. Furthermore, instructing the jury on an unnamed felony would provide inadequate information for a jury to properly weigh the conviction's probative value as impeaching evidence. We hold that the proper application of the balancing test under Tenn. R. Evid. 609(a)(3) requires identification of a prior conviction.

*Id*. at 122 (citations omitted). We conclude that the same analysis applies to rulings pursuant to Tenn. R. Evid. 404 and 405.

Although it was error for the trial court to admit evidence of Defendant's two unnamed felony convictions, any error was harmless given the evidence against Defendant. Based on the foregoing, we conclude that Defendant is not entitled to relief on this issue.

> B.    *Defendant's Admissions of Prior Bad Acts and Admission of the "Pseudoephedrine Log" into Evidence*

First, Defendant argues that the trial court erred in allowing the State to introduce evidence that he told Agent George during a recorded interview about his prior use and manufacture of methamphetamine. More specifically, Defendant objects to the following statements from the interview: (1) Samuel Fultz approached Defendant in the past to exchange methamphetamine for pseudoephedrine pills; (2) Defendant said that he used

methamphetamine in the past before going to classes and that his use was a "continuous cycle"; (3) Defendant used his cell phone to communicate with others regarding methamphetamine; and (4) Defendant said that he used the "red phosphorous method" to manufacture methamphetamine. We note that the State did not address each instance of prior bad acts raised by Defendant.

It is well-established precedent "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Tenn. Rule of Evid. 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b) Advisory Comm'n Cmts.; *see State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985); *State v. Hooten*, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under Rule 404(b), the rule provides that (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

The rationale underlying Rule 404(b)'s exclusion of evidence of a defendant's prior bad acts is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial. *Id.*; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996).

Defendant was convicted of violating Tennessee Code Annotated section 39-17-433, promotion of methamphetamine manufacture:

(a) It is an offense for a person to promote methamphetamine manufacture.
A person promotes methamphetamine manufacture who:

13

(1) Sells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use;

(2) Purchases or possesses more than nine (9) grams of an immediate methamphetamine precursor with the intent to manufacture methamphetamine or deliver the precursor to another person whom they know intends to manufacture methamphetamine, or with reckless disregard of the person's intent; or

(3) Permits a person to use any structure or real property that the defendant owns or has control of, knowing that the person intends to use the structure to manufacture methamphetamine, or with reckless disregard of the person's intent.

In this case, Defendant filed a pretrial "MOTION IN LIMINE REGARDING REDACTION OF CHARACTER EVIDENCE AND DEFENDANT'S CRIMINAL HISTORY FROM RECORDS." In a jury-out hearing at trial, defense counsel objected to the admission of portions of Defendant's statement to Agent George when Defendant spoke of "prior bad acts." The trial court and both parties then determined that a redacted version of the recording of the statement would be played for the jury which was consistent with a paper transcript that was prepared for Agent George to read to the jury. Although Defendant's statement was redacted to some degree, defense counsel suggested that additional redactions were necessary. The State indicated that further redactions would cause a delay in the proceedings. The trial court then stated:

Well, let's hear what you're complaining about. And I know that, that there are, in effect, prior bad acts when you talk about using before school. But they're very minor, and frankly, it appears to me that because of the defense announced in opening, and legitimately, I mean, it was legitimate to say this is our defense, you didn't have to, but you did, and that's perfectly legitimate as a strategy, it is - - apparently, the defense is coercion by the brother.

The description in the, in these transcripts of the prior, of prior activities, frankly, seems highly relevant to me to negate that. It - - when you read this narrative, it, it, it appears that the defendant is very, very much involved in the process, not as an unwilling participant, but as a, as a full participant in the process.

14

So, I, I now think that the, this amount of prior activity is, number one, highly probative, and number two, when compared to any, any unfair prejudicial effect, I, I think the probative value far outweighs the, the prejudicial effect. I'll be glad to listen to you on any specific parts, but as a general proposition, I think because of the defense, that some of these things have become much more probative than they were before.

The fact that somebody was an addict two years before, ten years before, that's one thing, but his descriptions of, of activities and being an active user, and he, he says I wasn't doing it to sell, but, of course, this is not a, a crime of sale. This is a crime of promotion of manufacture. So, I think most of what he, I think everything he has to say is highly probative.

And, I mean, certainly, you can argue to the jury that he says all along it wasn't to sell it, but the General's going to say, Well, that's not - - I'm anticipating that the General will say, Well, that's not necessary to this particular crime, it's not possession with something with intent to sell or it's not a sale charge, it's promotion of methamphetamine manufacture.

The trial court substantially complied with the requirements of Rule 404(b), and we conclude that the trial court did not abuse its discretion by finding that the evidence was probative of a material issue other than showing that Defendant acted "in conformity with [a] character trait." Tenn. R. Evid. 404(b). The proof showed that Defendant bought matches, was tearing the striker pads from the matches at the time of the stop, Defendant was in a car with individuals who had pseudoephedrine pills and hydrogen peroxide, and he had pseudoephedrine pills in his pants. The State in this case had to prove that Defendant was guilty as a principal or under the theory of criminal responsibility in that he participated in the offense of promotion of methamphetamine manufacture with the others in the car. The evidence in the recorded interview was admissible to prove defendant's intent to manufacture methamphetamine and to rebut testimony suggesting that Defendant was intimidated and coerced by "D" into participating in the offense. Defendant is not entitled to relief on this issue.

Next, Defendant asserts that the trial court erred by allowing the "pseudoephedrine log" into evidence. First, he argues that the log is inadmissible as character evidence of prior crimes in violation of Tenn. R. Evid. 404(b). Defendant further argues that the pseudoephedrine log is hearsay and that the State failed to "establish that the document was a business record as required under [Tenn. R. Evid.] 803(6)."

15

Defendant filed a motion in limine "to exclude methamphetamine portal records." In a pretrial hearing, the following exchange took place:

[Prosecutor]: Well, there's still - - I don't think it would require an evidentiary hearing, defendant's pretrial motion number one, motion to exclude methamphetamine portal records. I don't think that's going to require an evidentiary hearing.

THE COURT: No. It's going, it's going to require some real eloquence on behalf of the defendant is what it's going to do. I mean, one of the issues, you know, did not know what it was for, those portal records are going to be awfully relevant on that and - - okay.

*     *     *

[Defense Counsel]: - - what we, what we have here is that the defendant was allegedly seen by law enforcement going into a business establishment buying matches. And so, with other two, other co-defendants who bought other things. My, my defendant, my - - the meth portal records, of course, refer to previous alleged purchases of ephedrine or pseudoephedrine. It's my contention they, that would be a type of propensity evidence that wouldn't apply to the matches, in other words, under 404(a), it, I, I think that it would be propensity evidence and, and disallowed. Now, I'm sure the State was going to rely on 404(b), which would - - as far as, perhaps, knowledge or intent.

But again, I, I, I just would, respectfully state that the meth portal records do not go to the intent of what he's accused of. This is a meth promotion case, Your honor, and he's accused of buying or purchasing or possessing or passing on ingredients with the knowledge that they would be used to make methamphetamines or of reckless disregard of their use. And I would just - - and if let in, again, Your Honor, I think that it would be unfairly prejudicial to, to defendant's case, Your Honor.

16

THE COURT:          Okay.  Respectfully, I, I feel that it would be highly, highly relevant on knowledge and intent.  And then question is whether that's outweighed by the unfair prejudicial effect.  Well, there's a prejudicial effect, but, respectfully, I don't think it's an unfair prejudicial effect at all.  So, in doing the balancing test, I, I conclude that it would be admissible.

At trial, Agent George testified that the log of Defendant's purchase history appeared to be "approximately four-and-a-half pages long."  Agent George further testified that Defendant attempted to make two purchases of pseudoephedrine the day before the present offenses occurred, and the sales were blocked.  Defendant did not object at trial to this specific testimony.  The State then moved to admit the pseudoephedrine logs into evidence as an exhibit, and the trial court noted that the logs would be admitted "[n]oting the prior objections[.]"

We agree with the trial court's conclusion that evidence in the pseudoephedrine logs were relevant to Defendant's knowledge and intent in this case.  The trial court substantially complied with the requirements of Rule 404(b), and we again conclude that the trial court did not abuse its discretion by finding that the evidence was probative of a material issue other than showing that Defendant acted "in conformity with [a] character trait."  Tenn. R. Evid. 404(b).

As for Defendant's argument that the trial court improperly admitted the pseudoephedrine log without establishing it as a business record in accordance with Tenn. R. Evid. 803(6), this issue is waived.  Defendant did not raise this specific issue in his motion in limine, at trial, or in his motion for new trial.  *See* Tenn. R. App. P. 36(a) ("Nothing is this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").  Tenn. R. App. P. 3(e) provides that in "all cases tried by a jury, no issue presented for review shall be predicated upon . . . [a] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." *See also State v. Lowe-Kelly*, 380 S.W.3d 30, 33 (Tenn. 2012)(noting that "[a] defendant who fails to provide specific grounds for relief in a motion for new trial risks failing to preserve those grounds for appeal.").

Defendant argues that this court should consider the issue under plain error review.  Our Supreme Court has held that appellate courts are not precluded from reviewing issues under the plain error doctrine.  *State v. Page*, 184 S.W.3d 223, 230 (Tenn. 2006). This Court may only consider an issue as plain error when all five of the following factors are met:

(1) the record must clearly establish what occurred in the trial court;

(2) a clear and unequivocal rule of law must have been breached;

(3) a substantial right of the accused must have been adversely affected;

(4) the accused did not waive the issue for tactical reasons; and

(5) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (internal quotations and citation omitted).

Under the plain error doctrine, the Defendant is not entitled to relief. The Defendant cannot establish that consideration of the error is "necessary to do substantial justice." As the State points out, the evidence against Defendant was overwhelming. Defendant was observed by task force agents going from store to store in an attempt to procure the necessary materials to manufacture methamphetamine. At the time of his arrest, Defendant had pseudoephedrine concealed in his pants, and he was attempting to remove the "striker plates" from matches that he had been observed purchasing in an attempt to obtain red phosphorous, a component of methamphetamine manufacture. Accordingly, the Defendant is not entitled to relief on this issue.

## C. *Thirteenth Juror*

Defendant contends that the trial judge who presided over his trial erred in performing his role as thirteenth juror by approving the verdicts. He argues that the trial court erroneously permitted testimony concerning Defendant's propensity to use and manufacture methamphetamine, and that the court should have set aside the verdict "based on the prejudicial testimony that the jury was permitted to hear during the trial."

Tennessee Rule of Criminal Procedure 33(d) imposes a mandatory duty on the trial judge to serve as the thirteenth juror in every criminal case. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). Rule 33(d) does not require the trial judge to make an explicit statement on the record. Instead, when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict. *Id.* Only if the record contains statements by the trial judge

18

indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror, may an appellate court reverse the trial court's judgment. *Id.* Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court finds that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995).

In this case, Defendant does not assert that the trial court failed to perform its duty or that the trial court indicated any disagreement with the jury's verdicts. Rather, he contends that the jury heard improper evidence of his prior convictions.

The record on appeal does not contain a transcript of the announcement of the jury's verdict. Therefore, as pointed out by the State, it is not known whether the trial court specifically approved the jury's verdict after it was announced. In any event, at the hearing on Defendant's motion for new trial, the trial court heard arguments from both Defendant and the State and overruled the motion for new trial. Thus, we may presume the trial court approved the jury's verdict. *Carter*, 896 S.W.2d at 122.

As previously held by this Court: "It is not our function to reweigh the evidence but merely to ensure that the trial court complied with its duty under Rule 33(d)." *State v. Ronald Dillman*, Jr., No. E2009-00648-CCA-R3-CD, 2010 WL 1854135, at *8 (Tenn. Crim. App. May 7, 2010) *perm. app. denied* (Tenn. Oct. 12, 2010). The trial court in this case complied with its duty under Rule 33(d). Defendant is not entitled to relief on this issue.

### D. Sentencing

Defendant contends that the trial court erred by failing to impose an alternative sentence of community corrections. We disagree.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court determined that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 709 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer,* 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore,* 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568

S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court imposes a sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Our Supreme Court extended the *Bise* standard to appellate review of the manner of service of the sentence. The Court explicitly held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). We are also to recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2010).

With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) (2010) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

20

A defendant who does not fall within subdivision (5) of Tennessee Code Annotated section 40-35-102, "and who is an especially mitigated offender or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(6). Generally, defendants classified as Range II or Range III offenders are not to be considered as favorable candidates for alternative sentencing. T.C.A. § 40-35-102(6). Additionally, we note that a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall consider" them. T.C.A. § 40-35-102(6) (emphasis added). Defendant in this case is a career offender. Therefore, he is not a favorable candidate for alternative sentencing. T.C.A. § 40-35-102(6)(A).

Even if a defendant is a favorable candidate for alternative sentencing under Tennessee Code Annotated section 40-35-102(6), a trial court may deny an alternative sentence because:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103.

A defendant is not eligible for probation, whether full probation, split confinement, or periodic confinement, unless he is sentenced to serve ten years or less. Tenn. Code Ann. § 40-35-303(a)(2013 Supp.). Defendant is ineligible for probation on his twelve-year sentence for promotion of methamphetamine manufacture. However, he is eligible for probation on the six-year sentence for failure to appear because the sentence actually imposed was ten years or less. *See* T.C.A. § 40-35-303(a).

Defendant specifically argues that he should have been sentenced to community corrections. Being sentenced to community corrections is not an entitlement. *State v. Grigsby*, 957 S.W.2d 541, 547 (Tenn. Crim. App. 1997) ("The Community Corrections Act was never intended as a vehicle through which offenders could escape incarceration."). The Community Corrections Act was meant to "[e]stablish a policy within the state to punish selected, nonviolent felony offenders in front-end community based alternatives to

21

incarceration, thereby reserving secure confinement facilities for violent felony offenders [.]" Tenn. Code Ann. § 40-36-103(1) (2006); *see also State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). Pursuant to statute, persons who satisfy all of the following minimum criteria are eligible for participation in a community corrections program:

> (A) Persons who, without this option, would be incarcerated in a correctional institution;
>
> (B) Persons who are convicted of property-related, or drug or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;
>
> (C) Persons who are convicted of nonviolent felony offenses;
>
> (D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;
>
> (E) Persons who do not demonstrate a present or past pattern of behavior indicating violence; [and]
>
> (F) Persons who do not demonstrate a pattern of committing violent offenses.

Tenn. Code Ann. § 40-36-106(a)(1)(A)-(F) (2006). However, persons who have already been sentenced to incarceration or who are on escape at the time of consideration will not be eligible, even if they meet these criteria. *See* Tenn. Code Ann. § 40-36-106(a)(2) (2006).

Even though an offender meets the minimum requirements for eligibility, he or she is not automatically entitled to participation in a community corrections program. *See State v. Ball*, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998); *State v. Taylor*, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987). Rather, the Act provides that the criteria shall be interpreted as minimum standards to guide a trial court's determination of whether that offender is eligible for community corrections. *See* Tenn. Code Ann. § 40-36-106(d) (2006).

At the sentencing hearing, the trial court reviewed all of Defendant's prior convictions and noted that he was a career offender. The trial court also made the following findings:

> Then the issue becomes alternative sentencing, and I do agree with the General's belief with regard to both probation and community corrections when we're looking at the, the 12 years in this situation. But in this particular situation, I believe that any presumption in favor of alternative sentencing is,

22

is tremendously overcome in this particular case by this man's history. And I think it's important here to say, as I discussed when we were, when one of the witnesses was testifying, we're not looking at the distinction between a paper record and, and something else. This paper record reflects how he's lived his life and what he's done.

We're looking at a time period of roughly 17 years. And in that time period, he's received sentences which total 49 years. Now, some of them were concurrent sentences, so I'm not saying if he served them all, he would have had a half a century in the penitentiary. But if you add them all up, you're going to, you're going to get what I got, which I believe is the 49 years. And I'm not talking about today, I'm talking about before today, so. There are multiple clusters over this time period. These are not in the remote past. They spread over the entire time period of his 17-year history.

Yes, I agree completely that meth is a major factor in his, in his problems. No doubt about that. No doubt about that. And, apparently, was part of what got him on the wrong path to begin with at the ripe old age of 19. Respectfully - - and, and meth is an overwhelming problem. It's one that's drowning us here in this district right now, and I would agree with the suggestion that the criminal justice system by itself will not prevail over this problem.

It's going to take the efforts of a lot of the people, including people using faith-based rehabilitation. It's going to take that. When someone has reached the point where this gentleman has reached, however, I do - - a particular program that does not require them and, I guess, cannot require them to stay, that would allow them to leave whenever they look the notion to is the absolute opposite of what this man needs. That is not what he needs. He's got to be restricted for an extended period of time in order to have any hope of recovery from this problem.

And that is not criticism of the folks in Sevierville [where Defendant desired to go to drug treatment]. I, I want us to have facilities that are medical facilities, that are psychiatric, and and facilities that are neither for the - - that are faith-based for the appropriate situation. And I like the idea that it's free, but it is, he is extremely ill-suited for that particular program because he's got to be restrained. And that's established without at [sic] doubt by his long history of criminal activity and not, not living within the restrictions of his release into the public.

So, respectfully - - I mean, he didn't finish this program. Now, he had a legitimate reason for coming back, but he didn't finish the program when he was there. And I do believe it, all that occurred in 2013. I think the one witness was just mistaken about the year, and that's an innocent mistake.

Has he taken responsibility for what he's done? No. No. I could not possibly reach that conclusion in this case, not because he insisted on having a jury trial, that's his absolute right. I, I'm not considering that at all and wouldn't.

But when you look back over the history, and, for instance, saying, looking back on the 3/8/03 incidents and he was not guilty of those, and well, I didn't have a preliminary hearing, and I was in the wrong place at the wrong time, he is either the least lucky person in the world who until now has had the worse lawyers in the world, or he's not yet taking responsibility for what meth has done to his life. He's not there yet. He looks so much healthier than when I first saw him, when we first locked him up, and I think incarceration is going to extend his life, quite frankly.

But looking at the factors I'm supposed to consider, and even with a presumption in favor of alternative sentencing, I find that that presumption is overcome in a very dramatic way. I find that confinement is absolutely necessary to protect society from someone, this defendant, with a long criminal history. I find that measures less restrictive have recently and frequently failed.

I find that there is a complete lack of the potential for rehabilitation in the absence of incarceration and that the risk of committing another crime on any king of alternative sentencing in his case would be not only a great risk but almost an inevitability. So, looking at all the factors, I find that he is not an appropriate candidate for alternative sentencing, which is really, as a practical matter, the only issue before me today.

The record supports the trial court's denial of community corrections for Defendant. Defendant is not entitled to community corrections because of his past convictions for vehicular homicide and facilitation of aggravated robbery. *See* T.C.A. § 40-36-106(a)(1)(E) and (F). However, despite his past convictions for violent offenses Defendant contends that he is eligible for community corrections under the "special needs" provision of the statute. The "special needs" exception allows offenders "who would be usually considered unfit for probation due to histories of chronic alcohol or drug abuse, or mental health problems, but whose special needs are treatable and could be served best in the community" to be eligible

for community corrections. T.C.A. § 40-36-106(c). Again, this specific issue was not addressed by the State. Therefore, the State waived its argument as to this particular issue. In any event, in order to be considered eligible for community corrections under the "special needs" provision, the trial court must first find that the defendant is eligible for probation. *State v. Grigsby*, 957 S.W.2d 541, 546 (Tenn. Crim. App. 1997); *State v. Boston*, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996); and *State v. Stanten*, 787 S.W.2d 934, 936 (Tenn. Crim. App. 1989). In this case, Defendant is not eligible for probation on his sentence for promotion of methamphetamine manufacture because the sentence is twelve years. Tenn. Code Ann. § 40-35-303(a)(2013 Supp.). Additionally, Defendant cannot be sentenced to community corrections for his six-year sentence for failure to appear because we affirm his sentence to incarceration for the twelve-year sentence. T.C.A. § 40-36-106 (a)(2)("Persons who are sentenced to incarceration or are on escape at the time of consideration will not be eligible for punishment in the community."). We also note that Defendant is not entitled to community corrections based on his repeated failure to comply with sentences involving release in the community. The presentence report reflects that Defendant has two violations of parole and one violation of probation in the past.

We conclude that the sentencing decision was in compliance with the purposes and principles listed by statute. *Bise*, 380 S.W.3d at 709-10. Defendant is not entitled to relief.

For the foregoing reasons, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

25